JAMES R. LANGDON v. MAY CLAYSON ET AL.

*Infants—Mortgage to pay purchase price of real estate—Ratification—Equity.*

1. An infant cannot ratify the purchase of land, after arriving at full age, by dealing with the title thus acquired as owner, without ratifying a mortgage given during his minority to secure a loan with which to pay off liens on the land which he had agreed to pay as a part of the purchase price.

2. Courts of equity will always view with special favor, and guard with jealous care, the rights of infants, but will not lend their aid to perpetrate wrongs upon innocent parties, nor aid in depriving them of their just rights.

Appeal from Montcalm. (Smith, J.) Argued April 10, 1889. Decided June 14, 1889.

Bill to foreclose a mortgage claimed to be void on account of infancy of mortgagor at date of its execution, etc. Defendant Palmer appeals. Decree granting relief prayed for affirmed. The facts are stated in the opinion.

*Lemuel Clute*, for complainant.

*Davis & Nichols*, for defendant Palmer.

CHAMPLIN, J. Complainant filed his bill January 4, 1887 to foreclose a mortgage.

As originally filed it contained only the usual statements

of bills of that kind. It alleged that May Clayson and Charles D. Clayson made their two promissory notes payable to complainant, dated March 28, 1882, one for $400 due three years from date, and the other for $500 due six years from date, with interest payable annually at 7 per cent. The mortgage was of even date, and was executed by May Clayson, and covered 40 acres of land in Montcalm county.

Luce and Palmer were made parties as subsequent purchasers or incumbrancers.

Palmer was the only defendant who answered. He set up that May Clayson was an infant under 21 years of age at the time she executed the mortgage, and that it was given to secure the debt of her husband, Charles D. Clayson.

He alleged that he purchased the premises on or about August 30, 1884, from May Clayson, paying therefor a valuable consideration, and obtaining a quitclaim deed, and afterwards, about the twenty-second day of October, 1884, after said May Clayson became of age, and for a valuable consideration, to the said May Clayson in hand paid, she made, executed, and delivered to him a warranty deed, and also revoked all former deeds and mortgages by her made before she became 21 years of age by inserting therein the following:

"It being the intention of the first party to convey to the second party all the title I had to the premises at the time I became twenty-one years of age, and to expressly revoke all former deeds and mortgages made by me before I became twenty-one years of age."

That the mortgage to complainant is void, and constitutes a cloud upon his title, which he asks to have removed, and he prays for relief and the benefit of a cross-bill.

The complainant then amended his bill of complaint, stating therein that May Clayson purchased the land from John Q. Wakely February 11, 1881, and took from him a warranty deed, in which the conveyance to her was made subject to two mortgages,—one for $300, given by James Rich and wife

to Thomas Fuller, guardian of May Fuller, and the other for $500, given by John Q. Wakely and wife to James Rich,— which mortgages were to be paid by May Clayson as part of the consideration for the land on her purchase from Wakely' and that she obtained the loan of the money from complain̄ ant for which said notes and mortgage were given to pay the above-mentioned mortgages, which she assumed when she purchased of Wakely; that such indebtedness was her own, and that Charles D. Clayson merely signed the notes as surety; that she represented herself to be 21 years old, and that complainant would not have loaned the money to her had he supposed that she was an infant.

He further stated that afterwards, and on the twenty-eighth of February, 1883, May Clayson sold and conveyed said land to John Q. Wakely by warranty deed, which contained this clause:

"The above is subject to a certain mortgage given to Langdon March 28, 1882, for $900."

That on September 2, 1884, said John Q. Wakely executed a deed of the land to V. B. Luce, and that, on July 22 and October 22, 1884, said May Clayson executed the deeds above referred to.

The bill charges Luce and Palmer with combining and confederating with May Clayson to cheat complainant; charges on belief that she was of full age when she executed the deed to Wakely, and therein ratified the mortgage; states that May Clayson and Charles D. Clayson have removed to and are residents of Dakota, and are pecuniarily irresponsible; that the facts and circumstances of the transaction entitle him; if she was a minor, to be subrogated to the rights of the mortgagees named in the deed to her from Wakely, and which she procured to be discharged with the money obtained from him.

The bill of complaint was taken as confessed against all of the defendants except Palmer, who answered the amended

bill, in which he sets up substantially the same defense as in the answer to the original bill, and denies all confederacy and connivance to cheat and defraud complainant; claims that he is the owner in fee; and claims, further, the benefit of a cross-bill, and that his title may be quieted.

Proofs have been taken, from which it appears that May Clayson, whose maiden name was May Fuller, was born May 15, 1862; that she was married to Charles D. Clayson prior to February 11, 1881.

On February 11, 1881, John Q. Wakely conveyed to May Clayson by warranty deed the land in question, in which deed is contained the following:

"Said second party taking said premises subject to two certain mortgages,—one of $300, given by James Rich and wife to Thomas F. Fuller, guardian of May Fuller, minor, etc., the other, $500, given by John Q. Wakely and wife to James Rich, together with accrued interest on the same; the amount of said mortgages being deducted from the purchase price of said premises on this purchase."

The mortgage to Fuller, guardian, bears date June 30, 1879, and is given to secure the payment of $300 on the third day of April, 1883, with interest at 7 per cent., payable annually.

The mortgage to James M. Rich, given by Wakely, bears date the first day of October, 1880, and is given to secure the payment of $500 on the first day of April, 1884, with interest at the rate of 10 per cent., payable semi-annually on the first days of October and April. No question is made as to the validity of these mortgages.

The next conveyance in the order of time is the mortgage to complainant, dated March 28, 1882, executed by May Clayson, to secure the payment of the notes set forth in the bill of complaint. On the same day, i. e., March 28, 1882, Ruth Ropp, the assignee of the mortgage executed by James M. Rich to Thomas F. Fuller, guardian, dated June 30, 1879, executed a full satisfaction and discharge thereof, and also,

on the same day, James M. Rich executed a full satisfaction and discharge of the mortgage given by Wakely to him on October 1, 1880. The mortgage to complainant and the two discharges above mentioned were each recorded in the register's office on the twenty-ninth of March, 1882, at 6 o'clock P. M.

On the twenty-eighth day of February, 1883, May Clayson executed a statutory warranty deed of the land to John Q. Wakely, which contains this sentence:

"The above is subject to a certain mortgage given to Langdon March 28, 1882, for nine hundred dollars."

This deed was placed on record February 12, 1884.

On the twenty-second day of July, 1884, May Clayson executed a quitclaim deed of the premises to Don E. Palmer. This was acknowledged before a notary public in Montcalm county, and was placed on record the thirtieth day of August, 1884.

On the second day of September, 1884, John Q. Wakely and his wife executed a quitclaim deed to V. B. Luce, which was placed on record September 3, 1884.

The next deed is dated October 22, 1884. It is a warranty deed from May Clayson to Don E. Palmer, and contains the clause following:

"This deed is executed and delivered by the first party for the purpose of supplementing and adding to a quitclaim deed, previously given by the first party to second party herein, and conveying the above premises, and adding thereto covenants of title; it being the intention of first party to convey to second party all the title I had to the premises at the time I became twenty-one years of age, and to expressly revoke all former deeds and mortgages made by me before I became twenty-one years of age."

This deed was not acknowledged until the fourth day of November, 1884, before a notary public of Brown county, territory of Dakota, and was placed on record on the fourteenth of November, 1884.

The only proof introduced on the part of the defendant was his title deeds from May Clayson, and testimony tending to prove her age, and that about $30 of the $900 loaned was used in paying either a store account or a note of Charles D. Clayson.

The second deed executed by May Clayson to defendant Palmer conveyed no title or interest in the land whatever, and there was nothing to which the covenants of warranty could attach. As independent covenants for title they were worthless, for the reason that the defendant was a married woman, and covenants had no connection with any separate property owned by her.

The complainant showed that the loan was obtained by May Clayson to take up and discharge the two mortgages that were void liens upon her property, and that it was used for that purpose, with the exception of a few dollars. The arrangement made was beneficial to May Clayson. The time for payment was extended, and the interest on $500 reduced from 10 to 7 per cent. The money was loaned by the complainant in good faith, and upon the supposition that May Clayson was of full age. Mr. Rogers, the agent of complainant, who made the loan, testifies that to appearance May Clayson was at that time 25 years old, and he got the impression from what was said and done that she was then of full age.

When the defendant obtained his quitclaim deed from May Clayson he had record notice of complainant's mortgage, and that it appeared to be the first lien upon the land. He had record notice that the legal title had been conveyed from May Clayson to Wakely by warranty deed expressly made subject to complainant's mortgage. More than a year had elapsed since May Clayson had attained her majority, and by no word or act had she repudiated or revoked the mortgage to complainant, or her deed to Wakely.

Defendant Palmer is not sworn as a witness, and there is nothing in this record which shows that he ever paid a dollar consideration for the land in question. He places himself upon a purely legal defense, and shows himself entitled to no equities whatever. The claim set up in the defense that this $900 was obtained, and the security given, to pay the debts of the husband of May Clayson, has failed substantially, and I think entirely. It is true that May Clayson in her disposition taken in Dakota says:

" The mortgage was given to secure my husband's indebtedness. Part of the money obtained on that mortgage went to pay off a first mortgage, and the balance went to pay other indebtedness of my husband."

But the proof is satisfactory that she is mistaken; that the money was not obtained to pay her husband's indebtedness, but to pay off incumbrances on her property; that she represented that to be the purpose when she obtained the loan, and that all but a very small fraction was then and there applied to that purpose.

More unsatisfactory is the testimony of E. Barrett and Mr. Rockafellow. Barrett is asked if he knows anything about what was done with the money that was borrowed of Mr. Rogers, the witness spoken of, and he replies:

" Well, I think it went to Mr. Rockafellow,—what they owed him. I suppose it was a family debt. I don't know whether her contract or his contracts,—store bill. He kept a store there at that time."

Mr. Rockafellow is asked if he recollected the transaction of giving the mortgage to Langdon, and if he knows anything about what was done with the balance of this money spoken of. He testified that part of it was paid to him,— that he did not remember the amount,—for a note he held against Charles Clayson. He could not say positively. He had quite a good deal to do with Clayson, and he thought the note was for a horse, and thought it was somewhere in the

neighborhood of $25 to $30.  He knows where he got the money, because he (Rockafellow) tried to make a loan for them to another party before that one.  They wanted to get the money partly to pay off the mortgages and partly to pay him.  They owed him a store account besides the note.

Rogers testified that they computed the amount due upon the mortgage indebtedness, and it came to nearly $900, and they said they would take $900.  There was a small balance over, probably one or two dollars.  Whatever it was, was paid to May Clayson, and he does not know what was done with it.  I do not think that this small balance, whether $1 or $30, that was paid to Mrs. Clayson after paying the mortgages, has anything to do with the validity of the mortgage in question.

It is evident that the object and purpose of making the loan of Mr. Langdon was to pay off and discharge the existing incumbrances upon May Clayson's land, and to substitute the lien of the Langdon mortgage for those, and obtain a longer time for payment at a lower rate of interest.  Upon what principle of equity or justice can the validity of this mortgage be attacked and set aside as invalid?  The infant was by her own oath then nearly 20 years of age.  She looked to be 25.  More than a year previously she had purchased this land, and taken the title in her own name, subject to the incumbrances, which she assumed and agreed to pay as part of the purchase price.  She has never repudiated this transaction, but has ratified and affirmed it after her majority by dealing with the title she thus acquired as owner.  She could not ratify the purchase without ratifying the agreement to pay the existing liens as part of the purchase money, nor without ratifying the manner in which she dealt with those liens.  She voluntarily sought complainant, and borrowed the money from him to pay off these incumbrances by placing another upon the premises.  By this she only shifted her obligation to pay Ropp and Rich to pay the same

purchase price to complainant. She is not harmed by this transaction, but is benefited.

While there is no absolute time in which an infant must act after he has arrived at the age of 21 to prevent the presumption of ratification arising from lapse of time, and while courts will not be curious to inquire whether the act was beneficial or not, or over-nice or stringent in applying the rule that he must act in a reasonable time when it is proper to protect his rights, yet when he has a right to repudiate a transaction in which he has not been defrauded or overreached, and where he has received and retained the benefit of the transaction, he must act with reasonable promptness, or he will be deemed to have ratified the act by acquiescence.

Under the facts of this case, independently of other considerations under which this mortgage must be treated and held as a valid security, a right-minded person never would have attempted to repudiate the mortgage executed for the purpose and under the circumstances of this case, and, after the lapse of more than one year after she reached her majority, she will, in aid of justice and equity, and to prevent fraud, be deemed to have intended to ratify the transaction by her silence and acquiescence.

It would be a reproach upon the administration of justice if a scheme so inequitable and unconscionable as this appears to be from the record should succeed. Courts of equity will always view with special favor, and guard with jealous care, the rights of infants, but they will not lend their aid to infants, or those who entrench themselves behind them, to perpetrate wrong upon innocent parties, or aid in depriving such parties of their just rights.

The decree of the circuit court is honest, and should be affirmed.

SHERWOOD, C. J., MORSE and CAMPBELL, JJ., concurred. LONG, J., did not sit.